[Cite as *State v. Anderson*, 2024-Ohio-843.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                             No. 112514

    v.                           :

MARIO R. ANDERSON,               :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** March 7, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-675042-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Steven N. Szelagiewicz, Assistant Prosecuting Attorney, *for appellee*.

Joseph V. Pagano, *for appellant*.

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Defendant-appellant, Mario R. Anderson, appeals his convictions following a jury trial. For the reasons that follow, we affirm in part, reverse in part, and remand for resentencing.

{¶ 2} In 2022, Anderson was named in a 17-count indictment charging him with four counts each of gross sexual imposition (Counts 1, 2, 3, and 11), rape (Counts 4, 6, 8, and 12), and sexual battery (Counts 5, 7, 9, and 13); two counts each of compelling prostitution (Counts 10 and 14) and soliciting (Counts 15 and 16); and one count of telephone harassment (Count 17). The charges stemmed from Anderson's sexual misconduct with his stepdaughter ("the victim").

## I. Jury Trial

{¶ 3} The victim testified that when she was 13 years old, Anderson moved in with her and her mother; Anderson and her mother married a short time later. She stated that she considered Anderson a father-figure, someone with whom she could confide in and discuss her interests and problems. According to the victim, they had a father-daughter bond, which she welcomed and appreciated because she did not have a good relationship with her biological father, at the time, or her mother; her mother would often make derogatory comments to her about her appearance. The victim stated that Anderson also made comments to her, but she interpreted them to be more complimentary — to boost her confidence. However, after reaching puberty, she realized the comments Anderson made were inappropriate, or at least inappropriate coming from a father-figure.

{¶ 4} The victim stated that by age 14, Anderson began groping and touching her on her buttocks and breasts. She said that he would touch her, and then he would masturbate, or he would have her bend over the couch and he would masturbate. She testified that this conduct occurred for a year or two, and then

when she turned 15 or 16 years old, it progressed to Anderson pressuring her for oral sex. She stated that typically he would perform oral sex on her while he masturbated, but one time she performed fellatio when she refused to have sexual intercourse with him. The victim testified that these acts would occur when her mother was sleeping or at work.

{¶ 5} Although she could not give specific dates or timeframes when these acts occurred, the victim testified that they occurred over 20 times from age 14 until she moved to Florida after turning 18 years old in July 2020. She stated that even after moving to Florida, Andreson pressured her into sending a graphic photograph of herself to him, yet he was dissatisfied because he wanted her to send a video.

{¶ 6} The victim explained that while she was living with him, Anderson would send her text messages asking about what she was doing or asking for "something." She stated that she would then go into his room or wherever he was, find out what he wanted from her, and then, "I would go to him and just handle what I had to handle." (Tr. 198.) She admitted that she would say "no" repeatedly, but that she would eventually "cave in" because he constantly bothered and pressured her — "it would take many no's to get a yes." (Tr. 265.) The victim admitted that Anderson never threatened or used physical harm, but that she felt manipulated and bribed, and that he threatened to blackmail her. She stated:

> If I said, no, it would always be like [he would] constantly keep begging. There was even times he got on his knees and cried to beg. And then if that didn't work, then he would like to guilt trip and be like, well, since you hate me, I'll just go ahead and face whatever happens. And then

whatever happens to me, happens. And he will — he said, like, if he was willing to accept everything that happens to him and just tell the truth.

(Tr. 216.)

{¶ 7} The state introduced photographs of text messages between the victim and Anderson from June 29, 2020 and September 2020. The victim read the messages aloud and explained the context to the jury. During one exchange, Anderson asked her "if you can fit me in tonight, I'll take whatever." (Tr. 214; exhibit No. 1.) The victim explained that he was asking for her to engage in a sexual activity. In another text conversation that occurred after she moved to Florida, he asked for a "Duo," which the victim explained was a video-chat. When she said no, he begged and offered to pay her $80, and after she repeatedly refused, increased the offer to $150. When she sent him a photograph instead, he was dissatisfied that it was not a video and responded to her, "do I have to blackmail you * * * [d]on't make me blackmail you for a video" (Tr. 231-232; exhibit No. 1.). He also suggested that if he left her mother, "who is gonna protect [the victim's little sister] * * * you already said your mom had some f***** up dudes." *Id.* The victim explained that on a prior occasion, she asked Anderson not to touch her little sister. After repeatedly telling him that she would not send him a video of her, she said,

> I've gave u things s*** that I didn't want to do Im not goin keep doing s*** just cuz u say like I said I paid my dues I've done a lot outta my comfort zone and just cuz I'm putting my foot down u wanna keep it up at least I've done s*** so knock it off

(Tr. 241, exhibit No. 1.) Instead of leaving her alone, Anderson persisted, assuring her he would delete everything, and if she sent a video she would never hear from him again. He reminded her "Ive seen every inch of you." (Tr. 241-242.)

{¶ 8} The victim stated that Anderson would buy her things, but after turning 15 or 16 years old, she started using Cash App, a mobile payment service that allows individuals to transfer money to one another using a mobile phone app. She stated that Anderson began sending her money through Cash App after the sexual activity escalated to oral sex. The state introduced photographs of Cash App transactions sent by Anderson to the victim. The victim reviewed the transactions and explained to the jury that Anderson used an emoji in the comment line when he offered her money for sexual activity; or would comment — "For you know"; "For right now!!!"; "For Tonight?" (Tr. 250-256; exhibit No. 2.) The victim admitted that there were other transactions from Anderson that did not involve sexual activity.

{¶ 9} On October 20, 2020, the victim told her father and stepmother what Anderson had coerced her to do since 2016. The victim and her stepmother went to the Brooklyn police department and made a report. Detective Sergeant Brian Glandorf testified that he reviewed the victim's report and received an email with photographs of text messages between the victim and Anderson. He stated that he subsequently obtained the victim's cell phone for the purposes of conducting a phone extraction. Detective Glandorf admitted, however, that he did not interview the victim's mother or other individuals with whom the victim had confided, or

obtain Anderson's cell phone, despite the victim telling him that Anderson's cell phone would be the best evidence.

{¶ 10} The jury found Anderson guilty of all charges. Following merger, the application of the Reagan Tokes Law, and the imposition of consecutive sentences, the trial court sentenced Anderson to a stated minimum term of 18 years with a maximum term of 22.5 years in prison. This appeal followed.

## II.  Crim.R. 16 — Phone Extraction Records

{¶ 11} After the jury was empaneled but before opening statements, the prosecutor advised the trial court that it had discovered that it provided the wrong cell phone extraction from the victim's phone to the defense during discovery. The prosecutor said that he gave Anderson's defense attorneys the correct extraction that morning. The prosecutor explained that the state had previously provided the defense photographs of text messages taken directly from the victim's phone, and that the phone extraction merely corroborated those photographs — that the text messages were sent between the victim and Anderson's cell phone.

{¶ 12} The defense objected to this late disclosure, contending that the extraction "decimate[d]" Anderson's defense and trial strategy. (Tr. 163.) Counsel admitted that he had received the photographs of the text messages and the phone extraction in June 2022. Counsel stated "that we, along with the state, didn't believe [the extraction] was relevant to the case, and did not at that time as we reviewed it [believed it] corroborate[d] the screen shots of text messages that we knew were relevant to the case." (Tr. 161-162.) Accordingly, because counsel believed that the

state could not corroborate the text messages with the extraction it provided, counsel believed that Anderson had a defense that the text messages were not from him. Counsel requested that the trial court prohibit the state from using the extraction during trial.

{¶ 13} The trial court overruled Anderson's objection, finding that the phone extraction duplicated the previously disclosed text messages. The trial court recessed for the day, however, to allow counsel time to review the phone extraction.

{¶ 14} In his first assignment of error, Anderson contends that the trial court abused its discretion when it denied his motion to exclude the victim's cell phone records because the state violated Crim.R. 16, and the violation resulted in prejudice that deprived him of a fair trial, the effective assistance of counsel, and due process. Specifically, he contends that the untimely disclosure (1) impacted his trial strategy of attacking the validity of the text messages; and (2) undermined the integrity of the judicial process because it deprived him of the opportunity to make knowing decision about accepting a plea.

{¶ 15} Crim.R. 16, which governs discovery in a criminal case, provides that the purpose of the discovery rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the judicial system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). The rule serves "'to prevent surprise and the secreting of evidence favorable to one party.'" *State v.*

*Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987).

{¶ 16} A trial court has broad discretion in regulating discovery and in determining a sanction for a discovery violation. *Darmond* at ¶ 33. Therefore, this court reviews the trial court's decision under an abuse-of-discretion standard. *See generally State v. Brown*, 2019-Ohio-1235, 134 N.E.3d 783, ¶ 91 (8th Dist.). When imposing a sanction, however, the trial court must inquire into the circumstances, balance the competing interests, and impose the least severe sanction that is consistent with the purpose of the rules of discovery. *Brown* at ¶ 86, citing *Papadelis*, at paragraph two of the syllabus.

{¶ 17} In determining the appropriate sanction, a trial court must consider the following three factors: (1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense; and (3) whether the accused was prejudiced. *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus. A defendant is not prejudiced when the undisclosed information is cumulative or does not come as a surprise to the defense. *See generally State v. Thomas*, 8th Dist. Cuyahoga No. 81393, 2003-Ohio-2648, ¶ 12.

{¶ 18} We initially note that the state did not introduce, use, or admit the phone extraction into evidence. Anderson, however, used text messages contained in the extraction during cross-examination of the victim, but did not move to admit

the extraction into evidence. Accordingly, the phone extraction evidence is not part of the App.R. 9(B) record.

{¶ 19} The trial court found that the phone extraction was duplicative of the text messages already provided to the defense during pretrial discovery. Accordingly, it determined that the least restrictive sanction would be to recess for the day to allow the defense to review the extraction. We find no abuse of discretion.

{¶ 20} First, the defense did not make any allegation that the state's late disclosure was willful or in bad faith. From the record, it appears that the defense may have known that the state provided the wrong phone extraction and thus, would not have been surprised that the state ultimately discovered its mistake. Moreover, there was no unfair surprise to the defense because the state previously provided the text messages, which the court determined were duplicative, and the state did not use any information from the extraction. Finally, the defense did not indicate at trial that Anderson would have entered a plea had the state timely provided the extraction.

{¶ 21} Rather, the defense used a text message exchange found only in the extraction that supported its defense that Anderson did not force the victim to engage in any illegal sexual activity. In one text message, the victim, without prompting, assured Anderson that she would engage in one more act of sexual activity. The defense extensively cross-examined the victim about the text messages, including questions why the text messages she provided were only from June 29, 2020 until September 2020. The defense established that no text conversations

existed prior to June 29, 2020, that corroborated the victim's testimony that Anderson touched her or forced her to submit to any illegal sexual conduct. Even after the defense's cross-examination, the state did not attempt to use the extraction to corroborate the text messages or the victim's testimony. Thus, Anderson has not demonstrated prejudice.

{¶ 22} Based on the foregoing, we find that the trial court did not abuse its discretion by denying Anderson's motion to exclude the victim's cell phone records as a sanction for the state's inadvertent violation of Crim.R. 16. The first assignment of error is overruled.

### III. Crim.R. 43 — Anderson's Absence From Trial

{¶ 23} After the close of all evidence, but prior to the start of closing arguments, the court was notified that Anderson was hospitalized. Based on information received, Anderson's brother had found him in his vehicle with multiple stab wounds to his abdomen. All indications were that Anderson's injuries were self-inflicted. The state requested that the trial proceed without Anderson present. Defense counsel objected, contending that it was possible that Anderson's injuries were not self-inflicted. The trial court permitted trial to continue, which included closing arguments, the jury charge, and the verdict. All parties agreed, however, to not acknowledge Anderson's absence to the jury.

{¶ 24} Anderson contends that the trial court committed prejudicial error by proceeding with trial in his absence in violation of R.C. 2945.12, Crim.R. 43(A),

Section 10, Article I of the Ohio Constitution, and the due process clause of the Fourteenth Amendment.

{¶ 25} A defendant has a fundamental right to be present at all critical stages of his or her criminal trial. *See* Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Section 10, Ohio Constitution; Crim.R. 43(A); *see also State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8. Crim.R. 43(A) incorporates a defendant's due process right to be physically present; however, this right is not absolute. *State v. White*, 82 Ohio St.3d 16, 26, 693 N.E.2d 772 (1998). In all prosecutions, the defendant's voluntary absence after the commencement of trial shall not prevent continuing the trial, including the verdict. Crim.R. 43(A); R.C. 2945.12; *State v. Harrison*, 88 Ohio App.3d 287, 290, 623 N.E.2d 726 (1st Dist.1993). Therefore, the defendant may waive his right to be present at trial by his own acts. *State v. Meade*, 80 Ohio St.3d 419, 421, 687 N.E.2d 278 (1997). Whether a defendant's absence from trial is voluntary is an issue of fact, and this court is bound to accept a trial court's finding if it is supported by competent and credible evidence. *State v. Dennis*, 10th Dist. Franklin No. 04AP-595, 2005-Ohio-1530, ¶ 12.

{¶ 26} In support of this assignment of error, Anderson relies on this court's decision in *State v. Sinclair*, 8th Dist. Cuyahoga No. 85235, 2005-Ohio-6011. In *Sinclair*, the defendant took an overdose of antidepressants, which left him so drowsy and incapacitated that he was unable to assist his counsel during jury selection. The following day, Sinclair refused to come to the courtroom from the

county jail. The trial court was advised that Sinclair had been placed on suicide watch due to the medication overdose. The court ordered Sinclair's medical records, which showed that prior to trial he was demonstrating bizarre behavior and had expressed suicidal thoughts. This court held that the trial court erred by proceeding with trial in Sinclair's absence without first conducting a thorough investigation of Sinclair's mental state and granting a one-day continuance.

{¶ 27} *Sinclair* is clearly distinguishable. First, we are unable to discern from the *Sinclair* opinion if the defendant was absent for the entire duration of the five-day trial or just one day. Unlike in *Sinclair*, Anderson had been present during voir dire, opening statements, and all witness testimony; he was voluntarily absent for closing arguments, the jury charge, and ultimately the verdict.

{¶ 28} Also, unlike *Sinclair*, the record before this court does not demonstrate that Anderson had displayed any mental deficiencies during the first day of trial, which would have forewarned the parties and the court that he was having suicidal ideations. Moreover, the information the parties and the court received revealed that Anderson's stab-wounds were self-inflicted. Although his defense team could not say for certain, they also "believed" that the injuries were self-inflicted. (Tr. 367.)

{¶ 29} Based on the foregoing, the trial court's determination that Anderson's absence was due to his own actions was supported by competent and credible evidence. Accordingly, we find no error in the trial court's decision to

proceed with trial in Anderson's absence. The second assignment of error is overruled.

## IV. Sufficiency and Manifest Weight of the Evidence

{¶ 30} In his third and fourth assignments of error, Anderson challenges the evidence presented at trial, contending that the state presented insufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence. Although he lists these assignments of error separately, Anderson relies on the arguments of one assignment of error to support the arguments of the other. Accordingly, this court will also address them together.

{¶ 31} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 8th Dist. Cuyahoga No. 109100, 2020-Ohio-4220, ¶ 32. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 32} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends

on its effect in inducing belief.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins*, at 387. In a manifest-weight analysis, the reviewing court sits as a "thirteenth juror" and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins* at 386.

{¶ 33} Although sufficiency and manifest weight are different legal concepts, manifest weight subsumes sufficiency in conducting the legal analysis; that is, a finding that a conviction was supported by the manifest weight necessarily includes a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also dispose of the issue of sufficiency. *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2015-Ohio-1946, ¶ 11, citing *Thompkins*; *see also State v. Nunez*, 8th Dist. Cuyahoga No. 104623, 2018-Ohio-83, ¶ 6.

### A. Gross Sexual Imposition, Rape, and Sexual Battery

{¶ 34} Anderson first contends that the state presented insufficient evidence to support his gross sexual imposition, rape, and sexual battery convictions as

charged in Counts 1, 2, 3, 4, 5, 6, 7, 8, and 9 because the victim did not specify when, where, or how often such conduct occurred.

{¶ 35} As an initial matter, we note that the sexual battery offenses, as charged in Counts 5, 7, and 9, merged with the rape offenses, as charged in Counts 4, 6, and 8 — with the state electing that the trial court sentence Anderson on the rape-offense counts.[1]

{¶ 36} The precise date and time a sexual assault occurs is not an essential element of the crime. *See* R.C. 2907.02. "'Where the exact date and time of an offense are not material elements of a crime nor essential to the validity of a conviction, the failure to prove such is of no consequence and it is sufficient to prove that the alleged offense occurred at or about the time charged.'" *State v. Ibrahim*, 8th Dist. Cuyahoga No. 102114, 2015-Ohio-3345, ¶ 32, quoting *State v. Madden*, 15 Ohio App.3d 130, 131, 472 N.E.2d 1126 (12th Dist.1984). Moreover, "particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity." *State v. Hemphill*, 8th Dist. Cuyahoga No. 85431, 2005-Ohio-3726, ¶ 54, citing *State v. Daniel*, 97 Ohio App.3d 548, 556, 647 N.E.2d 174 (10th Dist.1944). This rule has

[1] When counts in an indictment are allied offenses and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence on the counts that are subject to merger because any error relating to those counts would be harmless. *See State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 25 (considering the sufficiency-of-the-evidence challenge only on those convictions surviving merger); *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count).

been established because "'[i]n many cases involving child sexual abuse, the victims are children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time.'" *State v. Cochern*, 8th Dist. Cuyahoga No. 104960, 2018-Ohio-265, ¶ 40, quoting *State v. Mundy*, 99 Ohio App.3d 275, 296, 650 N.E.2d 502 (2d Dist.1994). Moreover, "'[t]he problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse.'" *State v. Thomas*, 8th Dist. Cuyahoga No. 94492, 2011-Ohio-705, ¶ 22, quoting *State v. Robinette*, 5th Dist. Morrow No. CA-652, 1987 Ohio App. LEXIS 5996, 8 (Feb. 27, 1987).

{¶ 37} In this case, the victim testified that Anderson's misconduct first occurred when she was 14, after reaching puberty. She stated that he would grope or touch her buttocks or breasts and then masturbate, or have her bend over the couch while he masturbated. Anderson's misconduct escalated to him performing cunnilingus on the victim, which she said occurred multiple times. She said he would pay her through Cash App after these incidents. Finally, she stated that after she refused to have sexual intercourse with Anderson, she performed fellatio. It was not unreasonable for the jury to believe that the victim was unable to remember exact dates and times, especially considering that the conduct occurred over a four-year period. Viewing the evidence presented by the state in a light most favorable to the prosecution, a rational trier of fact could have found all the elements of rape and gross sexual imposition proven beyond a reasonable doubt.

{¶ 38} Anderson next challenges his rape convictions by contending that because the victim denied that "penetration" occurred, the state failed to prove the element of "sexual conduct" as required under R.C. 2907.01(A). R.C. 2907.01(A) does not require penetration to complete the act of cunnilingus; it requires no further activity beyond the placing of one's mouth on the female's vagina. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 86. The victim testified that Anderson performed cunnilingus on her by placing his mouth on her vagina. (Tr. 196.) This conduct is sufficient to support the three rape offenses involving the act of cunnilingus.[2]

{¶ 39} Finally, Anderson contends that the state failed to prove the element of "force" because the victim never testified that he forced or coerced her, or that because she viewed him as an authority figure, she felt compelled to perform these sexual acts. According to Anderson, the victim only described feeling guilty or "caving in," and even volunteered to perform some acts.

{¶ 40} "Force" is defined in R.C. 2907.01(A)(1) to mean "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." The Supreme Court of Ohio expanded this definition by recognizing "coercion inherent in parental authority when a father sexually abuses his child." *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. If it can be shown

---

[2] Anderson has not made any challenges to Counts 11 (gross sexual imposition); Count 12 (rape, to wit: fellatio); and Count 13 (sexual battery, to wit: fellatio).

that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.* at 58-59, citing *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E. 2d 390 (8th Dist.1985); *see also State v. Dye*, 82 Ohio St.3d 323, 328, 695 N.E.2d 763 (1998).

> "Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose."

*Eskridge* at 59, quoting *State v. Etheridge*, 319 N.C. 34, 47, 352 S.E. 2d 673 (1997).

{¶ 41} Based on the record before this court, the state presented sufficient evidence that Anderson coerced the victim into engaging in sexual activity. The evidence reveals that Anderson groomed the victim by giving her that father-daughter bond that the victim yearned for but lacked. Moreover, the victim and her mother did not have a strong bond, which Anderson used to his advantage. The evidence showed that Anderson and the victim commiserated with each other about her mother's treatment of them, the victim would often confide in Anderson, and Anderson would compliment her when her mother would criticize. The victim explained that this verbal praise turned inappropriate and then evolved into groping and sexual misconduct.

{¶ 42} Although the victim did not use the words "forced" and "coerced," she stated she felt "manipulated" and "had no choice." The evidence showed that Anderson would threaten the victim with blackmail or would use her little sister as

leverage, questioning who would protect her little sister if he left the victim's mother. The victim felt her only way to escape Anderson was to move out of state, yet his constant pressuring, harassing, and manipulating conduct continued until she reported the abuse.

{¶ 43} Based on the foregoing, a reasonable juror could find that Anderson used his parental status to force the victim into submitting to sexual activity. This is not the exceptional case where the jury clearly lost its way in finding Anderson guilty of gross sexual imposition and rape.

### B. Compelling Prostitution

{¶ 44} Anderson next contends that the state did not prove that he knowingly paid or agreed to pay a minor to engage in sexual activity because the Cash App records and the victim's testimony were insufficient. We disagree.

{¶ 45} Anderson was charged with compelling prostitution in violation of R.C. 2907.21(A)(3)(a), which provides that "[n]o person shall knowingly * * * [p]ay or agree to pay a minor, either directly or through the minor's agent, so that the minor will engage in sexual activity, whether or not the offender knows the age of the minor."

{¶ 46} The victim's testimony, coupled with the Cash App transactions and text messages, demonstrate that Anderson paid the victim to engage in sexual activity. She testified that after she turned 15, Anderson would pay her after he performed cunnilingus on her or she performed fellatio. This testimony is sufficient to support his convictions for compelling prostitution. Moreover, the Cash App

transactions reflecting payment from Anderson and Anderson's text message that he had seen "every inch" of the victim's body corroborates the victim's testimony that Anderson engaged in sexual activity with her. The jury did not lose its way in finding him guilty in Counts 10 and 14.

### C. Soliciting and Telecommunications Harassment

{¶ 47} Anderson summarily contends that his convictions for soliciting and telecommunications harassment are unsupported by the evidence. We disagree.

{¶ 48} The state charged Anderson in Counts 15 and 16 with soliciting, in violation of R.C. 2907.24(A)(2) and (A)(1), respectively, which at the time of the offense, provided that

(A)(1) No person shall solicit another who is eighteen years of age or older to engage with such other person in sexual activity for hire.

(2) No person shall solicit another to engage with such other person in sexual activity for hire if the other person is sixteen or seventeen years of age and the offender knows that the other person is sixteen or seventeen years of age or is reckless in that regard.

*See* former R.C. 2907.24(A)(1) and (2), amended April 21, 2021.

{¶ 49} The victim testified that prior to and after turning 18 years old, Anderson sent her text messages asking for sexual activity in exchange for payment. The victim's testimony was corroborated with the text messages exchanged between them and the Cash App transactions. Accordingly, the weight of the evidence supports Anderson's soliciting convictions in Count 15 and 16.

{¶ 50} Regarding his conviction for telecommunications harassment that occurred after the victim moved out of state, Anderson texted the victim asking for

a sexually explicit video of her. In support, the state introduced the text messages in which the victim repeatedly told him "no" and pleaded with him to leave her alone. Nevertheless, Anderson continued to pressure and harass her until she finally submitted to his manipulation and sent him a photograph of her body. Still dissatisfied, Anderson continued with the harassment until the victim just stopped responding. The weight of the evidence supports Anderson's conviction for telecommunications harassment in violation of R.C. 2917.21(B)(1).

{¶ 51} Anderson's fourth assignment of error is overruled.

## V. Jury Instruction on Parental Force

{¶ 52} Requested jury instructions in a criminal case must be given when they are correct, pertinent, and timely presented. *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59, 253 N.E.2d 785 (1969), paragraph one of the syllabus. The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. The giving of jury instructions, however, is within the sound discretion of the trial court, and we review that decision for an abuse of discretion. *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35, citing *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993).

{¶ 53} The trial court provided the statutory definition and standard "force" instruction to the jury: "Force means any violence, compulsion or constraint

physically exerted by any means upon or against a person or thing." (Tr. 419); R.C. 2907.01(A)(1). At the request of the state and over objection by the defense, the trial court also gave the jury the following instruction on "parental force":

> Force of a parent or other authority figure. Where the relationship between the victim and the defendant is one of a child and stepparent, the element of force need not be openly displayed or physically brutal. It can be subtle, slight, and/or psychological, or emotionally powerful. If you find beyond a reasonable doubt that the victim's will was overcome by fear or duress or intimidation, the element of force has been proven.

(Tr. 419.)

{¶ 54} In his fifth assignment of error, Anderson contends that the trial court abused its discretion in providing the parental force instruction. He maintains that "psychological pressure and manipulation by a father against a daughter is not sufficient to find force in this case." (Appellant's Brief, p. 25.) According to Anderson, the victim never testified to being threatened or coerced, but rather was persuaded and thus, "caved in."

{¶ 55} As previously discussed, "force" does not have to be overt and physically brutal, but can be "subtle and psychological where coercion is inherent in a parental-authority when a father sexually abuses his child." *Eskridge* at 59. If such evidence of psychological coercion exist; giving an *Eskridge* parental-force jury instruction is appropriate.

{¶ 56} Anderson contends that *Eskridge* should not apply, however, because the victim was older than the four-year-old child victim in *Eskridge*. We disagree. In fact, Ohio appellate courts have routinely rejected this notion that the victim must

be of such "tender years" before the *Eskridge* standard applies. *See, e.g., State v. Milam*, 8th Dist. Cuyahoga No. 86268, 2006-Ohio- 4742 (13-year-old victim; defendant was best friend's father); *State v. Dippel*, 10th Dist. Franklin No. 03AP-448, 2004-Ohio-4649 (14-year-old victim; defendant was victim's father); *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926 (15-year-old victim; defendant was driver's education teacher); *State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603 (13-year-old victim; defendant was victim's father-figure); *State v. Musgrave*, 9th Dist. Summit No. 18260, 1998 Ohio App. LEXIS 5557 (Nov. 25, 1998) (13-year-old victim; defendant was victim's adult friend).

{¶ 57} This court in *Milam* held that whether a parental-force jury instruction is warranted depends on whether the victim's will was overcome by fear or duress. *Id*. at ¶ 15.

> In determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health, and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered.

*Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496 (1952), paragraph two of the syllabus; *Milam* at ¶ 15.

{¶ 58} Based on the circumstances surrounding Anderson's conduct, the parental-force jury instruction was proper. The evidence established that Anderson groomed the victim and used his parental status to compel and manipulate her to

engage in sexual activity. Accordingly, Anderson's fifth assignment of error is overruled.

## VI. Ineffective Assistance of Counsel

{¶ 59} During opening statements, Anderson's defense counsel told the jury:

[Anderson's] character isn't guilt. And that's a defense. We'll put our hands up. [Anderson] acted disgustingly. He would retrieve pictures from [the victim] and masturbate. There's no denying that fact. * * * He would go into the living room and he would masturbate. He would masturbate to pictures of [the victim]. As stated, his character is disgusting, it's horrid. And I wouldn't want anyone to experience that. But at the end of the day, ladies and gentlemen, his character isn't guilt. Evidence is guilt. And the accusations made by [the victim] doesn't equate to guilt. * * * his character is disgusting. He would masturbate to the pictures. But what for I want for you all to keep in your minds, is that his character does not equate to guilt. Evidence equates to guilt. And there's no corroborating evidence in this case that supports the accusations made by [the victim].

(Tr. 176-178.)

{¶ 60} Defense counsel began his cross-examination of the victim by saying:

[F]irst and foremost, you appear a little nervous today * * * what happened to you was pretty terrible right? * * * And no one, no one should have to go through all of that. And I apologize for what you did go through. Unfortunately we kind of have to go through some details just to make sure we know exactly what happened. Okay.

(Tr. 258.)

{¶ 61} And in closing argument, Anderson's counsel said:

[T]his is a case of she said. Everything that you heard throughout the last few days is on the basis of what [the victim] said, what she said to her Xbox friends, what she said to the Brooklyn Police Department, what she said to her stepmother, and ultimately what she said to you. Beyond the words that [the victim] said we have nothing. We have nothing to corroborate her accusations. * * * [Anderson's] character doesn't equate guilt. We know that he participated in certainly

immoral, disgusting acts. We admit it, he would masturbate to the pictures. * * * We're not denying that.

(Tr. 387.)

{¶ 62} Anderson contends in his sixth assignment of error that he was deprived of his Sixth Amendment right to effective assistance of counsel because his defense team made these prejudicial comments during trial that ultimately vouched for the credibility of the victim.

{¶ 63} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defense to deprive the defendant of a fair trial. *State v. Nieves*, 8th Dist. Cuyahoga No. 111161, 2022-Ohio-3040, ¶ 27, citing *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 109. Deficient performance occurs when counsel's performance falls below an objective standard of reasonable representation. *State v. Bell*, 8th Dist. Cuyahoga No. 105000, 2017-Ohio-7168, ¶ 23. Prejudice is found when "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 64} A defendant has the burden of proving ineffective assistance of counsel and there is a strong presumption that a properly licensed trial counsel rendered adequate assistance. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). As the *Strickland* Court stated, a reviewing court "must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland* at 689; *see also State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). A defendant's failure to satisfy one part of the *Strickland* test negates a court's need to consider the other. *State v. Hurst*, 12th Dist. Brown No. CA2014-02-004, 2014-Ohio-4890, ¶ 7.

{¶ 65} Based on the record before this court, we do not find that Anderson's defense attorneys' representation was deficient. It is apparent that counsel made a strategic decision to acknowledge Anderson's conduct, but focus on the lack of evidence corroborating the acts. To argue otherwise could have caused counsel to lose credibility with the jury. The defense recognized the inability to dispute the text messages the victim testified to, but focused on the lack of evidence proving force, sexual contact, or sexual conduct — elements necessary for gross sexual imposition, rape, and sexual battery.

{¶ 66} Additionally, Anderson's attorneys admitted to the jury that while the acts revealed in the texts (masturbating while looking at photographs) were disgusting, immoral, or horrid, they were not illegal, and argued that the sexual contact and conduct the victim testified about was not corroborated by the evidence. It is a sound legal strategy to admit to some bad acts because it allowed counsel to reasonably argue that the illegal acts did not happen. Accordingly, this court will not second-guess defense counsel's case strategy. *State v. Sallie*, 81 Ohio St.3d 673,

674, 693 N.E.2d 267 (1998). Nor does this court use hindsight to judge instances of trial strategy that backfire or prove unsuccessful. *State v. Martin*, 9th Dist. Lorain No. 15CA010888, 2017-Ohio-2794, ¶ 10; *State v. Stragisher*, 7th Dist. Columbiana No. 03 CO 13, 2004-Ohio-6797, ¶ 18. "The end result of tactical trial decisions need not be positive in order for counsel to be considered effective." *Martin* at *id.*, quoting *State v. Heer*, 10th Dist. Franklin No. 97APA12-1670, 1998 Ohio App. LEXIS 4453, 8 (Sept. 24, 1998). Accordingly, based on our review of the record, we conclude that Anderson's defense team was not ineffective in its trial strategy.

{¶ 67} The sixth assignment of error is overruled.

## VII. Consecutive Sentences

{¶ 68} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry," and a failure to do so is contrary to law. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. The trial court is not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 69} Trial courts must therefore engage in the three-tiered analysis of R.C. 2929.14(C)(4) before imposing consecutive sentences. *Id.* First, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. Second, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. R.C. 2929.14(C)(4). Third, the trial court must find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 70} We review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2), which permits this court to increase, reduce, or otherwise modify a sentence or vacate a sentence and remand for resentencing if this court "clearly and convincingly" finds that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4), or that the sentence is "otherwise contrary to law."

{¶ 71} Accordingly, a defendant can challenge consecutive sentences on appeal in two ways. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4). *State v. Bolden*, 8th Dist. Cuyahoga No. 110841, 2022-Ohio-2271, ¶ 26, citing R.C. 2953.08(G)(2)(b) and *State v. Nia*, 2014-Ohio-2527, 15 N.E.3d 892, ¶ 16 (8th Dist.). Second, the defendant can argue that the record does not support the court's findings made pursuant to R.C. 2929.14(C)(4). *Bolden* at *id.*, citing R.C. 2953.08(G)(2)(a) and *Nia* at *id.*

{¶ 72} Anderson contends in his final assignment of error that the trial court's imposition of consecutive sentences, over objection, was contrary to law and the findings were not supported by the record.

{¶ 73} In this case, the court ordered Counts 4, 6, 8, and 12 to run consecutive to each other.

> The Court finds that it is necessary to protect the public and punish the offender and it is not disproportionate to the conduct, and at least two of the multiple acts were committed as a part of one or more courses of conduct and the harm is so great or unusual that a single term does not adequately reflect the seriousness of the conduct.

(Tr. 477-478.) The court also incorporated those findings into the judgment entry of conviction in accordance with *Bonnell*.

{¶ 74} Although it appears that the trial court made the requisite findings, the trial court's second finding, commonly referred to as the disproportionality finding, was incomplete. The second finding requires the trial court to find that "consecutive sentences are not disproportionate to the seriousness of the offender's

conduct *and* to the danger the offender poses to the public." (Emphasis added.) R.C. 2929.14(C)(4). The trial court did not include the second prong of this finding.

{¶ 75} This court recently considered this identical issue where the trial court's disproportionality finding was deficient. *State v. Banks*, 8th Dist. Cuyahoga No. 112735, 2023-Ohio-4655. The court found that "[w]hile a word-for-word recitation of the language of the statute is not necessary, the proportionality finding is stated as a *conjunctive phrase* and the trial court is required to consider the proportionality of the sentence regarding *both* the seriousness of the offender's conduct *and* the danger the offender poses to the public." (Emphasis added.) *Id.* at ¶ 14, citing *State v. Spencer*, 8th Dist. Cuyahoga No. 101131, 2014-Ohio-5430, ¶ 8. Accordingly, "[t]he "trial court is not permitted to impose consecutive sentences where it failed to make" both facets of the proportionality finding. *Id.* The *Banks* Court found that it was unable to discern from the record that the trial court made all the requisite findings and thus, reversed the sentence and remanded the matter to the trial court to make the findings, if appropriate.

{¶ 76} The dissenting judge in *Banks* stated that although the court did not use the exact language in the statute, he would find that the court made the full disproportionality finding based on the trial court's statements during sentencing and the colloquy with the victim and the defendant. *Id.* at ¶ 18-21 (Celebrezze, J., dissenting). The dissent specifically noted that when the victim answered the court's questions, she stated that she lived in fear during her tumultuous relationship with Banks, and that other victims had reached out to her. The dissenting opinion also

noted that when the court addressed the defendant about his ten prior domestic violence convictions and prior felonious assault and assault charges, Banks refused to accept accountability and brushed off the court's questions, prompting the trial court to ask defense counsel, "How is he an asset to the public when he has 10 prior convictions for domestic violence?" *Id.* at ¶ 20. Accordingly, the *Banks* dissent believed the entirety of the sentencing hearing demonstrated compliance with R.C. 2929.14(C).

{¶ 77} In this case, a thorough reading of the transcript reveals that the trial court engaged in a formal sentencing. It did not make any personalized statements or remarks during sentencing that would allow this court to glean from the entirety of the record that the trial court employed the proper analysis and made the full disproportionality finding as required by R.C. 2929.14(C)(4). Although the court indicated that it had reviewed the laws associated with sentencing, the presentence-investigation report, and the presentencing briefs, it did not make any comments about the contents of those reports and briefs. The court did not engage in any colloquy with the victim advocate (the victim was not present for sentencing), Anderson, or counsel. Accordingly, there is nothing that this court can glean from the record to support a conclusion that the trial court made the full disproportionality finding.

{¶ 78} Based on the precedent in *Banks* and the statutory requirements of R.C. 2929.14(C)(4), failure to make all the requisite findings prior to imposing consecutive sentences renders the sentence contrary to law. Accordingly, we reverse

Anderson's sentence and remand the case to the trial court for the limited purpose of complying with the statutory language of R.C. 2929.14(C)(4) to make the necessary record-supported findings (if the court finds that the imposition of consecutive sentences is appropriate), and to incorporate those findings into the judgment entry of conviction. Anderson's seventh assignment of error is sustained.

## VIII. Conclusion

{¶ 79} Judgment affirmed in part, reversed in part, and remanded to the trial court for a limited resentencing in accordance with this court's opinion.

It is ordered that parties shared equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, in part, any bail pending appeal is terminated. Case remanded to the trial court for a limited resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., and
ANITA LASTER MAYS, J., CONCUR